PROSKAUER ROSE LLP
Bettina B. Plevan (BP-7460)
Megumi Sakae (MS-0839)
1585 Broadway
New York, New York 10036
(212) 969-3000
Attorneys for Defendant CBS Outdoor Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
SAMUEL JORDAN,                      :    ECF
                                    :
               Plaintiff,           :    05 CV 5497 (SHS)
                                    :
                                    :
        against                     :    STATEMENT OF MATERIAL
                                    :    FACTS PURSUANT TO
                                    :    LOCAL RULE 56.1
VIACOM OUTDOOR GROUP and LOCAL 153, :
OFFICE AND PROFESSIONAL EMPLOYEES   :
INTERNATIONAL UNION AFL-CIO,        :
                                    :
                                    :
               Defendants.          :
----------------------------------- X

       Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, Defendant CBS Outdoor Inc. ("Outdoor") (f/k/a "Viacom Outdoor Inc." and mistakenly sued as "Viacom Outdoor Group"), by its attorneys Proskauer Rose LLP, submit the following Statement of Material Facts as to which Outdoor contends there is no genuine issue to be tried:

**I.    Background**

       1.    Outdoor is in the business of displaying advertisements on billboards and other locations, including throughout the New York Subway system in subway cars and subway stations. (Murphy Tr. 20, Jordan Tr. 31-32, 46-47; Dorion Decl., ¶ 2.)

2. Jordan was hired by Outdoor on or around August 2001 as an advertisement installer trainee. (Jordan Tr. 27.)

3. During his employment with Outdoor, Jordan held three various, but similar positions at Outdoor, including carding (installing advertisements in subway cars), clocks (installing advertisements on clocks in subways) and bill posting (installing advertisements or posters on subway platforms). (Jordan Tr. 31-32, 44, 46-47; Murphy Tr. 20; Dorian Decl., ¶ 3.)

4. Advertisement installers post (or install) and remove advertisements. (Murphy Tr. 20; Jordan Tr. 31-32, 46-47.)

5. On or around August 2004, Jordan was assigned as a bill poster and continued to be a bill poster until his termination on December 14, 2004. (Jordan Tr. 43; Dorion Decl., ¶ 7.)

6. The subway platforms on which Jordan installed and removed posters as a bill poster were indoors and outdoors. (Jordan Tr. 127.)

7. At the time his employment was terminated, Donald Dorian was Jordan's immediate supervisor. (Jordan Tr. 43, 73; Dorian Decl., ¶ 7.)

**II.   Outdoor's Policies**

8. During his employment, Jordan had a copy of Outdoor's Employee Policy Manual. (Jordan Tr. 136-37, 239.)

9. The policy provides in part, "The following categories are examples of conduct, which may be grounds for immediate discharge without performance counseling or progressive discipline. . . . In addition to lying and other types of dishonesty, this might include conduct that involves . . . forgery or falsification of records." (Sakae Decl., Ex. G at DO 00053; Jordan Tr. 138-39.)

10. Outdoor has consistently discharged employees who falsify work sheets without progressive discipline. (Murphy Tr. 21, 22, 38.)

2

11. The Employee Policy Manual also included a provision that prohibited falsification of time records. (Jordan Tr. 239; Sakae Decl., Ex. G at DO 00052.)

12. Jordan was aware that an employee who falsified his time records would be subject to disciplinary action. (Jordan Tr. 239-40.)

### III. Bill Posting/Certification of Completed Work

13. As a bill poster Jordan was responsible for five different routes, one of which was the "E route," which consisted of Pelham Park, Buhre Avenue, Middletown Road, Zerga Avenue, Castle Hill and St. Lawrence subway stations. (Jordan Tr. 62-63, 87; Dorion Decl., ¶ 8.) These station platforms are all above ground. (Jordan Tr. 128; Dorion Decl., ¶ 8.)

14. Each day bill posters report to Ely Avenue and are given a bundle of posters to be posted for the day, which they fold and soak with paste prior to going on their route. (Jordan Tr. 46, 47; Dorion Tr. 12.)

15. The paste that Outdoor uses for posting is very firm and, once dry, posters cannot be completely removed. (Acheampong-Quaye Tr. 22.)

16. If a poster is installed and is later removed, remnants of the poster or the paste will remain on the surface where it was posted. (Jordan Tr. 103-04; Acheampong-Quaye Tr. 27-28.)

17. Bill posters know where to install posters based on a work sheet that is given to them every day. The work sheet explains which posters need to be removed ("dead posters") and which new posters need to be installed. (Jordan Tr. 49; Dorion Decl., ¶ 4.)

18. Jordan removed dead posters by either scraping or chipping away at them with a blade or simply covering them up with a new poster. (Jordan Tr. 50-51.)

19. Jordan indicated on his work sheet the posters he removed by placing an asterisk next to the ones he scraped. (Jordan Tr. 65.)

3

20. Jordan indicated on his work sheet the posters he installed by placing a check mark in the appropriate box. (Jordan Tr. 64.)

21. The work sheets signed by Jordan on November 3, 2004 and December 9, 2004 read: "I certify that all work was assigned to me on this form was completed by me on this day the hours designated! I have also completed any repairs given to me as well." (Dorion Decl., Exs. 1, 2; Jordan Tr. 66.)

22. Jordan understood the certification to mean that he was certifying that he had installed the posters that he was assigned on the work sheet. (Jordan Tr. 66.)

23. Jordan knew he had to certify that he completed the work on the work sheet because Outdoor submitted bills to its clients based on his certification that he completed the work. (Jordan Tr. 67.)

24. Every day, once he completed the work sheet and signed it, he returned to Ely Avenue and turned his completed work sheet into Outdoor. (Jordan Tr. 41, 56.)

**IV.  Jordan's Falsification of His Time Sheets**

25. On October 15, 2004, Jordan received a written reprimand for falsifying his time sheet on Friday, October 8, 2004. (Jordan Tr. 193; Sakae Decl., Ex. I.)

26. On October 8, 2004, Jordan left work at or around 1:40 p.m. rather than 3:30 p.m., his scheduled quitting time. (Jordan Tr. 232, 233-34, 238; Sakae Decl., Ex. I.)

27. Jordan filled out his time sheet on October 8, 2004 in the morning, indicating he started at 7:00 a.m. and ended at 3:30 p.m. (Jordan Tr. 232, 238.)

28. After he decided to leave early, he did not change his time sheet. (Jordan Tr. 14-16.)

29. The proper procedure would have been for Jordan to sign out on his time sheet when he left, not at a different time. (Dorion Tr. 36.)

4

30. Jordan was aware the he would be subject to discipline if he falsified his time records. (Jordan Tr. 239, 240.)

31. Jordan received a reprimand for falsifying his time sheet and was docked two hours of pay. (Jordan Tr. 193, 232, 233.)

32. Jordan did not grieve the reprimand. (Jordan Tr. 231; Bracero Tr. 21; Murphy 42-43.)

## V. Dorion Inspects Jordan's E Route

33. On December 9, 2004, Plaintiff's immediate supervisor, Donald Dorion, received a call from the station manager of a station along Plaintiff's E route. (Dorion Tr. 22, 23; Dorion Decl., ¶ 10.)

34. The station manager complained that the posters looked terrible, as if they had not been maintained. (Dorion Tr. 23; Dorion Decl., ¶ 10.)

35. On Friday, December 10, 2004, Dorion inspected five stations along Jordan's E route. (Dorion Tr. 10, 23, 37; Dorion Decl., ¶ 11.)

36. On his inspection, Dorion brought with him Jordan's work sheets from the past two months. (Dorion Decl., ¶ 12.)

37. At each of the five stations Dorion inspected, except St. Lawrence Street station which had recently been repaired, posters that Jordan had certified that he had installed on his work sheets from November 3 and December 9 were missing. (Dorion Decl., ¶ 13.)

38. Dorion was aware posters listed on Jordan's November 3, 2004 work sheet as installed were missing because the contracts for these posters were still in effect and the posters should have been installed. (Dorion Decl., ¶ 14.)

39. Dorion was aware posters from Jordan's December 9, 2004 work sheet were missing because Jordan's work sheet showed he was assigned to install posters the day before Dorion's inspection. (Dorion Decl., ¶ 15.)

40. During the inspection, Dorion made contemporaneous notes of which posters were missing by highlighting the missing posters directly on Jordan's work sheets. (Dorion Decl., ¶ 17, Exs. 1, 2.)

41. During Dorion's inspection on December 10, Dorion observed at the Buhre Avenue station that there were three posters missing (two Hot 97 posters, one from December 9 and one from November 3, and one Tanqueray poster from December 9), *i.e.*, Jordan had certified on his work sheet that he had installed five posters, but Dorion observed only two of those posters installed. (Dorion Decl., ¶ 21, Exs. 1, 2, 3.)

42. During Dorion's inspection on December 10, Dorion observed at the Middletown Road station that there were four posters missing (three Hot 97 posters, one from December 9 and two from November 3, and one Tanqueray poster from December 9), *i.e.*, Jordan had certified on his work sheet that he had installed seven posters, but Dorion observed only three of those posters installed. (Dorion Decl., ¶ 22, Exs. 1, 2, 3.)

43. During Dorion's inspection on December 10, Dorion observed at the Zerega Avenue station that there were three posters missing (two Hot 97 posters, one from December 9 and one from November 3, and one MTA subtalk poster from December 9), *i.e.*, Jordan had certified on his work sheet that he had installed three posters, but Dorion did not observe any of those posters installed. (Dorion Decl., ¶ 23, Exs. 1, 2, 3.)

44. During Dorion's inspection on December 10, Dorion observed at the Castle Hill Avenue station that there were three posters missing (two Hot 97 posters, one from December 9

and one from November 3 and one Tanqueray poster from December 9), *i.e.*, Jordan had certified on his work sheet that he had installed five posters, but Dorion observed only two of those posters installed. (Dorion Decl., ¶ 24, Exs. 1, 2, 3.)

45. Based on Dorion's December 10 inspection, there were five posters missing from Jordan's November 3 work sheet and eight posters missing from Jordan's December 9 work sheet, for a total of thirteen missing posters that Jordan had certified he had installed but which were not in fact installed. (Dorion Decl., ¶ 25, Exs. 1, 2, 3.)

46. There were no remnants of posters or glue residue on the boards where posters were missing. (Dorion Decl., ¶ 16.)

47. In addition, there were several posters from expired contracts ("dead posters") that Jordan was supposed to have removed but which were still installed at the stations. (Dorion Decl., ¶ 26.)

## VI. Jordan's Falsification of His Work Sheet Uncovered

48. On Tuesday, December 14, 2004, Jordan joined his supervisors, Dorion and Betancourt, for an inspection of Jordan's E route. (Jordan Tr. 98.)

49. They inspected the stations at Castle Hill, Zerga Avenue, Middletown Road and Buhre Avenue. (Jordan Tr. 100.)

50. At each station they inspected, posters were missing. (Jordan Tr. 100.)

51. During this inspection, Jordan did not claim that the posters had fallen off in the rain. (Jordan Tr. 78.)

52. Jordan admits that if the posters had fallen off, there should have been glue residue on the frames, but there was none. (Jordan Tr. 103-04.)

### VII. Jordan Cannot Explain the Missing Posters and Falsification of Work Sheets to Outdoor

53. On Thursday, December 16, 2004, Jordan met with the William Murphy (Executive Vice President and Director of National Operations), Magnus Acheampong-Quaye (Vice President of National Operations) and Betancourt. (Jordan Tr. 75.)

54. The Union's representatives were unable to attend the meeting and Murphy explained to Jordan that he did not have to speak until his union representatives were present. (Jordan Tr. 111; Murphy Tr. 9-10.)

55. Jordan chose to continue with the meeting without union representation. (Jordan Tr. 111-12; Murphy Tr. 10.)

56. At the meeting on December 16, 2004, Jordan was given an opportunity to explain why his work sheets reflected that he had posted certain new posters and scraped off dead posters when that work was not done. (Murphy Tr. 10-11; Acheampong-Quaye 8-9.)

57. Jordan did not claim that the posters had fallen off in the rain. (Jordan Tr. 124-25.)

58. Jordan did not dispute that had the posters fallen off, there should have been glue residue in the frames. (Jordan Tr. 114.)

59. Murphy did not have any involvement with Jordan and his grievance after this meeting. (Murphy Tr. 30.)

### VIII. Jordan Cannot Explain the Missing Posters and Falsification of Work Sheets to His Union

60. On December 23, 2004, Jordan met with Acheampong-Quaye, Dorion, Betancourt, the Union's business agent, Michael Thompson, and the shop steward, Vinny Bracero. (Jordan Tr. 146.)

8

61. Jordan was offered an opportunity to explain the inconsistently between his work sheets and the missing posters on his route. (Jordan Tr. 207.)

62. Jordan did not dispute that if the posters fell off, there would be residue. (Jordan Tr. 148.)

63. Jordan did not claim that the posters had fallen off in the rain. (Jordan Tr. 208.)

64. During the meeting, Bracero was hoping Jordan would say something to help his case, but Jordan was at a loss for words. (Bracero Tr. 23.)

65. After the meeting, Thompson and Bracero went to Acheampong-Quaye's office and told him that they intended to ask Murphy to reinstate Jordan. (Acheampong-Quaye Tr. 14.) Acheampong-Quaye explained that progressive discipline would not apply to the falsification of work sheets and that Jordan will likely not get his job back. (Acheampong-Quaye Tr. 14.)

66. Thompson then set up a date for Jordan to appear before the Grievance Committee. (Jordan Tr. 150-51.)

### IX. Jordan Is Given a Full Opportunity to Explain the Missing Posters to the Grievance Committee, but Cannot

67. On January 13, 2005, Jordan appeared before the Grievance Committee. At the meeting was Thompson, Patricia Hoffman (Co-Chairperson) and two other members of the Grievance Committee. (Jordan Tr. 82.) No one from Outdoor was present. (Hoffman Tr. 11.)

68. The Grievance Committee consists of a group of Union business agents who ensure that the cases that go forward to arbitration are those that the Union believes are true and can win. (Hoffman Tr. 6, 8.)

69. The Grievance Committee is partial to the employee. (Hoffman Tr. 7-8.)

70. During the meeting the Grievance Committee asked Jordan to explain a work sheet and bill posting. (Jordan Tr. 159, 161.)

9

71. Jordan was given a full opportunity to explain his story. (Hoffman Tr. 12-13.)

72. Jordan did not claim that the posters had fallen off in the rain. (Jordan Tr. 216-17.)

73. Jordan could not produce any witnesses. (Jordan Tr. 219-20.)

74. Jordan did not have a reason to believe that someone at the Union wanted him fired. (Jordan Tr. 166.)

Dated: April 21, 2006
      New York, New York

PROSKAUER ROSE LLP


By: /s/ Bettina B. Plevan
    Bettina B. Plevan (BP-7460)
    Megumi Sakae (MS-0839)

1585 Broadway
New York, New York 10036
(212) 969-3065
*Attorneys for Defendant CBS Outdoor Inc.*